EDWARD P. LUPFER & FREDERICK N. REMICK, partners, &c.,

*v.*

THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF
ATLANTIC et al.

[Submitted April 10th, 1917.   Decided April 21st, 1917.]

1. A provision in specifications for building a bridge which character-
ized as liquidated damages checks deposited by the bidders, is in the
nature of a penalty, to be strictly construed, and works a forfeiture only
if the contract is lawfully awarded and wrongfully declined.

2. A proposal not in harmony with the plans and specifications cannot
be accepted.

3. In an action by successful bidders to recover a deposit, complain-
ants are not estopped from setting up the invalidity of the award.

4. Where the award was unlawful because the proposal varied from
the specifications, there could be no forfeiture of· the deposit.

5. In such case there was no implied agreement to .modify the pro-
posal to comply with the specifications.

6. A successful bidder cannot arbitrarily withdraw his bid at any
time before acceptance.   Such bid is in the nature of an option giving
the municipality a vested right of contract.

7. Where no time was specified for acceptance of bids, after an un-
reasonable delay in executing the contract, the successful bidder may
withdraw his bid.

8. Such delay does not amount to an extension of time for executing
such contract, where it appears that the successful bidders persistently
endeavored to secure a contract corresponding to their proposal.

. 9. Where for about three months the counties refused to comply with
the demands of the bidders to execute such a contract, during which
time the price of labor and materials greatly increased, the bidders are
entitled to relief on equitable principles.

On bill, &c.

*Mr. Auguste Roche, Jr.,* for the complainants.

*Mr. Enoch A. Higbee* and *Mr. James Mercer Davis,* for the
defendants.

BACKES, V. C.

The counties of Atlantic and Burlington advertised for proposals for the building of a highway bridge spanning Mullica river on the Ocean boulevard, joining the two counties. The complainants' proposal was accompanied by a certified check for $5,000 as a good faith that they would sign the contract upon the acceptance of their bid. Their bid was the lowest, and upon an alleged award of the contract, and a default by the complainants, the counties declared the check forfeited. This suit is to invalidate the forfeiture and to recover the money.

The proposed bridge was to be of the modern steel structure type, of four fixed spans with a bascule span in the centre, electrically operated, to permit navigation, supported by steel enclosed concrete piers resting upon wooden piles sunk into the bed of the river. The plans furnished by the counties illustrate the stationary portion of the bridge only and indicate that the piers supporting the bascule span, of oblong shape, were to be set in the stream transversely and seventy-four feet apart from centre to centre, which distance was to be the length of the bascule span. Concerning the bascule span, the specification provided that—

"Each bidder will submit detailed plan and specifications of one, or more, kind of two-leaf, deck, bascule span and the owners of the Rall, Scherzer and Strauss patents (Scherzer Rolling Lift Bridge Company, Chicago, Ill.) have been furnished plans and specifications from which they may prepare plans and specifications for the use of bidders, and bidders may secure from these owners full information regarding the plans and specifications."

Bidders were not limited to the Rall, Scherzer & Strauss patents, and some of them submitted plans of other makes with their proposals which met all requirements. The complainants and other bidders obtained from the Scherzer company plans of its patented device, showing the piers upon which the bascule span rested, reversed, set lengthwise with the stream and nearer to each other by four and one-half feet from centre to centre, and calling for a span only sixty-nine and one-half feet long. The distance between the exterior of the piers remained the same. Evidently they were intended to be stationed so as to

require a minimum of span, consistent with federal navigation regulations. The complainants based their estimate and submitted their bid both as to length of span and position of piers according to the plans furnished them by the Scherzer company, anticipating a modification of the counties' plans by lengthening the four fixed spans proportionately four and one-half feet, to accommodate the stationary portion of the bridge to the bascule span, as designed by the owners of the patent; and by a notation upon the plans of the bascule span submitted with their proposal, the complainants notified the counties of the discrepancies in the two sets of plans and announced their attitude and their expectations.

Whether the predicament thus created by the plans of the Scherzer company failing to accord with those of the counties, is chargeable to the counties, because of their adoption in the specifications, or to a misconception of the complainants as to which set of plans obtained, is of no moment. Nor is it of any consequence, in determining the right to the deposit, whether the complainants subsequently, in the course of negotiations, tacitly agreed to a modification of their proposal providing for a bascule span of the required length, as the defendants contend. The decision turns upon other considerations. The provision in the specifications and proposals relating to the deposit, which is therein characterized as liquidated damages in case of default, is in the nature of a penalty, to be construed strictly and to be interpreted as working a forfeiture only if the contract was lawfully awarded and wrongfully declined. *Fairbanks, Morse & Co.* v. *City of North Bend, 68 Neb. 560; Perine Cont., &c., Co.* v. *Pasadena, 116 Cal. 6.* The construction of the bridge was authorized by chapter 46 of the laws of 1914, page 67, and under the statute the contract was to be awarded to the lowest responsible bidder upon competitive bidding after public advertising. *P. L. 1912 p. 593.* This limitation upon the exercise of the power restricted the counties to an award of the contract to the bidder who qualified, not only by being the lowest as well as responsible, but also who, by his bid, proposed to do the work in the manner prescribed by the call. As to all other bids not in compliance with the terms upon which they were received,

their duty, and the only course open to them, was to reject. *Scola* v. *Board of Education, 77 N. J. Law 73;* Shaw v. Trenton, 49 N. J. Law 339; Van Reipen v. Jersey City, 58 N. J. Law 262. That the complainants' proposition to build the bridge did not meet, and was altogether out of harmony with, the plans and specifications upon which bids were invited, must be conceded, and that the variance was of a nature not to admit of an award, cannot be seriously controverted. The specifications comprehend a completed bridge ready for travel, and this obviously could not have been achieved by a contract combining the defendants' plans and specifications with the complainants' proposition; if it be assumed that the complainants bid, as to the stationary portion of the bridge, according to the counties' plans. Their bid, based upon their own conception of the bridge, was, of course, gratuitous.

Furthermore, it is to be noted that the points of difference between the Scherzer company's plans and specifications as prepared and submitted, and those called for, are not only as to length of bascule span and position of piers, but the additional weight of the leaves made necessary a general reapportionment of dimensions and of materials and a readjustment of appliances to insure a perfect balance. Of these details, plans and specifications were to be furnished, as evidenced by the official specifications for the bridge, which required that the bascule design was to include full power equipment, adequate to operate both leaves, and also signals, brakes and all modern safety devices, and that "all of these items must be accurately and fully described by specifications and shown by plans to be submitted by the bidders," including a description of bearings, machinery parts and power equipment. This requirement could not be dispensed with. In *Case* v. *Trenton, 76 N. J. Law 696,* the lowest bidder to whom the contract was awarded failed to give a description of the properties of asphalt to be used in the paving of a street and the proportions of the several ingredients of the wearing surface of the street pavement, &c., as demanded by the specification. The court of errors and appeals rejected the bid and set aside the award, holding that "these omissions seem to be more than mere irregularities which the municipal authorities

might waive. In consideration of the present situation, we are
not to confine our view to this case and consider whether the
contract with Mr. McGovern is a reasonable one, or as advan-
tageous to the city as any contract which it will be likely to se-
cure. We must consider the public policy which underlies the
requirements of competitive bidding. The purpose of the
statute requiring competitive bidding is that each bidder, actual
or possible, shall be put upon the same footing. The municipal
authorities should not be permitted to waive any substantial
variance between the conditions under which bids are invited
and the proposals submitted. If one bidder is relieved from
conforming to the conditions which imposes some duty upon
him, or lays the ground for holding him to a strict performance
of his contract, that bidder is not contracting in fair competi-
tion with those bidders who propose to be bound by all the con-
ditions. This is the policy which prevents the modification of
specifications after bids have been presented, and the awarding
of the contract to one of the bidders based upon such revised
specifications."

The complainants are not estopped from setting up the in-
validity of the award (*Fairbanks, Morse & Co. v. North Bend*),
and, as the award of the contract was unlawful, there could be
no forfeiture.

This result renders it unnecessary to decide whether the com-
plainants implicitly agreed to modify their proposal relative to
the bascule span; but, as counsel laid considerable stress upon
this question, a brief discussion may serve to reconcile their
widely-divergent views.

It was nearly a month after the bids were received that the
county engineer of Atlantic county discovered the conflict in the
plans and advised the complainants that the discrepancy in the
dimensions must be made up so as to correspond with the plans
on file. Shortly afterwards a controversy arose over the char-
acter of coffer-dams to be used in setting the piers; the complain-
ants claiming that steel shells, which were to permanently en-
close the piers, could be efficiently utilized, while the engineer
contended that the specifications comprehended coffer-dams in-
dependent of the shells. The use of the shells would have saved

some $15,000, and from later developments it seems that they would have answered the purpose. The engineer declined to recede from his position, and the complainants adhered tenaciously to their interpretation of the specifications. During the entire period of negotiation, some eighty-two days in all, the complainants repeatedly urged the execution of the contract, which had been delayed through no fault of theirs, all the time, apparently, studiously ignoring the engineer's suggestion to modify their plans and specifications. Silence often spells assent, but nowhere here do I find any intimation that the complainants were willing to entertain a contract modified, unless the counties would concede the use of the shells as coffer-dams, and in fact no legitimate inference can be drawn other than that the complainants were willing to bargain only if this concession were made. From this position they did not swerve, and the most that can be said is that the implied promise was upon condition which was not performed.

Forfeiture is also resisted on the ground that the complainants lawfully withdrew their bid before the award was made, and also that they justifiably withdrew, before the award became effective, because of undue delay in awarding the contract. June 9th, 1915, at Atlantic City, was fixed as the time and place for receiving the bids. At a meeting of the board of freeholders of Atlantic county, held on that day, a resolution was passed awarding the contract to the complainants, "provided, however, that before such award shall be binding it must be concurred in by the board of chosen freeholders of the county of Burlington." On July 7th following, the board of freeholders of Burlington county resolved to award the contract to the complainants,

"subject to the sale of the bonds hereinafter provided for, and subject to the ratification and approval of said contract and of the terms of this resolution by the board of chosen freeholders of the county of Atlantic."

A bond issue of $40,000, to defray one-half the cost of the bridge, was authorized to be issued, in form as attached to the resolution, and to be sold at public auction. On July 14th the Atlantic county board passed a further resolution reciting the foregoing facts and in which it resolved to accept the terms as

set forth in the resolution of the Burlington county freeholders, and authorized the proper officers of the board to enter into a contract with the complainants, subject to approval by the solicitor of the board. The Burlington county bonds were advertised to be sold on September 1st, and, presumably, were sold on that day. Prospective bidders—bondbrokers—questioned the legality of the proceedings, and a correctional and confirmatory resolution was passed by the Atlantic county board on August 11th. In the meanwhile the price of materials and the wage of labor rose by leaps and bounds, as is well known, owing to the war, and the more favorable period for the doing of the work, within the two hundred working days allowed by the specifications, was rapidly passing, when, on August 30th, one day before the award automatically went into effect, the complainants, after almost constantly importuning the counties to accelerate the execution of the contract, withdrew their bid, assigning as reasons the non-conformity of their bid with the defendants' requirements, unreasonable delay in awarding the contract, thereby imposing the burdens of increased cost of materials and labor and of the doing of the work during an unfavorable season at an increased cost, and also because the defendants' engineers declined to concede the correctness of the complainants' construction of the specifications concerning the coffer-dams.

I cannot agree with the proposition advanced by the complainants' counsel that a successful bidder for public improvements may arbitrarily withdraw his bid at any time before its acceptance and escape with his guarantee against a default; a view which finds expression in a *dictum* in the opinion of the United States circuit court for the northern district of New York, in *Moffett Co.* v. *Rochester, 82 Fed. Rep. 255.* A competitive bid submitted under statutory privilege and regulation is in the nature of an option to the municipality, based upon a valuable consideration, to which the principles of law governing options, generally, are applicable. The consideration passing is the privilege of bidding and the legal assurance to the successful bidder of an award as against all competitors. Such an option pending action consistent with its terms, expressed or implied, is a vested right of contract, of which the municipality

cannot be deprived, except, perhaps, by its consent, and is remediable at law by an action for damages, or enforceable in equity by specific performance, if feasible, or may be summarily dealt with by forfeiture of the penalty prescribed. To sanction any other rule would open the door to fraud, and render wholly abortive the legislative scheme for public competitive bidding.

It seems to me, however, that the complainants were justified in withdrawing their bid, because of the failure to promptly and decisively accept it. In other words, the option to the counties expired by its own limitation. Here there was no specified time for acceptance, and in the absence of a fixed period it is to be presumed that a reasonable time, under the circumstances, was agreed upon, and in my opinion the maximum of this time was reached when the two boards passed judgment upon the bids and awarded the contract, provisionally, on July 7th. This formal action is cogent proof of ample opportunity for examining the bids, investigating the fitness of bidders, and discharging all other essentials, preparatory to the boards' exercise of their *quasi*-judicial function, and circumscribed the time tacitly agreed upon for the making of the award. While much could be said in criticism of the delay up to that time, further postponement of finality of action was without legal excuse, and the complainants were thence at liberty to withdraw their bid, and any concessions thereafter made by them were matters of grace, subject to such conditions as they deemed fit to impose. It is to be admitted that the vicissitudes of trade are the risks of the bidder, but this hazard has its limitations and in reason could not be prolonged by an award which might or might not have eventuated in a binding contract; depending altogether upon whether one of the counties could raise funds by a sale of its bonds. Bidders did not bargain upon this contingency. It was not a condition precedent to their right to enter into the contract that the counties should be first in funds, as was the case in *Hurley* v. *Trenton, 66 N. J. Law 538; 67 N. J. Law 350.*

The defendants attempt to meet this right to withdraw by asserting that the complainants' delay in withdrawing amounted to a consent to an extension of the time for the execution of the contract until the bonds were sold, September 1st. As

already observed, the complainants persisted in their endeavors to secure the contract, but, as we have seen, they, from a very early period in the proceedings, were insistent upon a contract embodying their construction of the specifications regarding the coffer-dams. This attitude is prominently reflected in the correspondence between the parties, and, in the absence of a willingness on the part of the counties to treat with them on this score, it is difficult to see how the complainants' conduct can be construed into a waiver, especially when it is apparent that they entertained no notion to do so, except upon the terms they laid down.

We have been considering the right of the complainants, to a return of their deposit, from a purely legal standpoint. But it is manifest, taking into consideration all of the elements and circumstances surrounding the transaction, that they are entitled to relief strictly upon equitable principles. To force from them a penalty for the failure to execute a contract which they agreed to undertake in June, the performance of which was suspended for nearly three months by the defendants, and which could then have been carried out only at a greatly advanced outlay, would work an oppressive and unconscionable hardship. And, as against the right to equitable relief, the complainants' perseverance to obtain the contract does not militate, because, as before stated, their efforts were bent solely upon securing a contract based upon a favorable construction of the specifications regarding the coffer-dams, which would possibly have resulted in a saving sufficient to offset the increased burdens. In fact, the complainants abandoned the undertaking only after a soaring of prices, during a long period of inaction on the part of the defendants, which forecast a heavy loss, and then only after the counties refused to yield their construction, whereby the losses might have been retrieved.

That a court of equity has jurisdiction to relieve from the enforcement of a forfeiture on legal or equitable grounds is undoubted. *Barlow* v. *Jones, 87 Atl. Rep. 649.* .

The complainants are entitled to a decree for $5,000, with interest from November 10th, 1915, the date when the forfeiture was enforced and the check cashed, and also costs of suit.