KINGSTON BITUMINOUS PRODUCTS CO., PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. NEW JERSEY TURNPIKE AUTHORITY, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 17, 1963—Decided June 27, 1963.

Before Judges GOLDMANN, FREUND and FOLEY.

*Mr. James A. Waldron* argued the cause for appellant and cross-respondent (*Messrs. Backes & Backes,* attorneys).

*Mr. Joseph R. Postizzi* argued the cause for respondent and cross-appellant (*Mr. Grover C. Richman, Jr.,* general counsel).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Kingston Bituminous Products Co. (Kingston) appeals from a Superior Court, Law Division judgment dismissing its action in lieu of prerogative writs, and defendant New Jersey Turnpike Authority (Authority) cross-appeals the dismissal of its counterclaim for damages.

I.

On March 21, 1963 the Authority publicly advertised an invitation for bids for Contract No. R-140, calling for resurfacing and other incidental work in various areas between Mile 56 and Mile 63 on the New Jersey Turnpike, located in Burlington and Mercer Counties. In this connection the office of the Authority's chief engineer prepared a brochure giving information governing the bidding, work to be performed, materials to be supplied, general and specific specifications, etc. Both the advertisement and brochure carried the following invitation:

"Proposals will be received at the New Jersey Turnpike Authority, Administration Building, New Brunswick, New Jersey, until 11:00 o'clock Eastern Standard Time, on the morning of April 16, 1963, at which time and place said proposals will be publicly opened and read."

The chief engineer of the Authority presided at the receipt of proposals on April 16. At or before 11 A. M. Kingston's representative, as well as those of three other contractors, submitted their respective bids. At 11:02 A. M. the chief engineer asked if there were any more proposals. None was submitted. He then inquired of the bid supervisor assisting

him whether any bidders were delayed in the lobby or elevator. The bid supervisor replied there were no other bidders. This is all the chief engineer heard, although it would appear that the supervisor said something more. At any rate, the chief engineer announced that bids were closed. The bid supervisor immediately spoke up in a louder voice and informed him that a prospective bidder had been delayed on the Turnpike because of construction operations.

The chief engineer knew that deck-slab replacement operations were in progress at the Passaic River Bridge that day, with resultant extensive traffic tie-ups on the Turnpike as a result of the center lane closings. He therefore at once announced to those present that a bidder had been held up on the Turnpike and that the opening of bids would be delayed a short time until the bidder arrived. Kingston's representative vigorously objected to the receipt of any further proposals. His objection was duly acknowledged and recorded. At about 11:23 A. M. the delayed bidder—the Ritangela Construction Corporation representative—arrived, the company's sealed bid was received, and the chief engineer then proceeded with the opening and reading of the proposals. Ritangela's bid was $365,610, Kingston's $375,193. On the same day, Kingston confirmed its objection to the receipt of the Ritangela proposal by both telegram and letter.

Following the opening and reading of the bids, the chief engineer recommended that the contract be awarded to Ritangela. He submitted his recommendation, together with an explanation of all the circumstances attending the opening of the bids, including the objection made by Kingston's representative, to the Authority's executive director. Two weeks later, on April 30, 1963, the Authority formally awarded the contract to Ritangela in the amount of $365,610.

Kingston then filed its complaint in lieu of prerogative writs on May 3, 1963 demanding that (a) the Authority be enjoined from entering into a contract with Ritangela for the work in question; (b) the award of the contract to Ritangela be set aside, and (c) the Authority be directed to

award the contract to Kingston. An order issued the same day, based upon the complaint and a supporting affidavit, ordering the Authority to show cause before the Law Division on May 16 why an injunctive order should not be issued restraining it according to the demand of the complaint until final hearing, and meanwhile enjoining it from entering into a contract with Ritangela. The order to show cause was served at once, but the Authority had only a few hours before executed the contract with Ritangela.

The Authority answered, denying Kingston's contention that the contract had unlawfully been awarded to Ritangela and that Kingston was the lowest responsible bidder. It also counterclaimed, alleging that the contract had been awarded to Ritangela on April 30, and executed at 11:45 on May 3; that Ritangela had at once proceeded to employ additional personnel, order materials and equipment, and commence moving construction equipment to the worksite; that plaintiff knew or should have known of the date when the contract was awarded, but elected to wait until May 3 to file its complaint; that the complaint was palpably defective in that it failed to state a cause of action, and was filed "for the purpose of harassing the defendant and frustrating its construction operations." Further, plaintiff had obtained and served an order to show cause on May 3, and in compliance with that order the Authority had on the morning of May 6 ordered Ritangela to stop all work until noon of that day; and that as a result of plaintiff's actions Ritangela had filed a claim with the Authority for $1,000 damages sustained by reason of the work stoppage.

The matter came on for a full hearing on May 15. At the conclusion of the case the Law Division judge, upon motion by plaintiff, dismissed the counterclaim on the ground that plaintiff's action involved a genuine issue of fact and law, and there was no proof that the complaint had been filed frivolously or for the purpose of harassing or obstructing the Authority. The court then rendered judgment against plaintiff on its complaint.

## II.

Plaintiff claims that defendant unlawfully awarded the contract to Ritangela because the Authority had materially departed from the bidding requirements and, further, violated its own established bidding policy. Under the material departure argument it points to defendant's invitation for bids stating that proposals would be received "until 11:00 o'clock Eastern Standard Time" on the morning of April 16, 1963, and claims that in violation of this provision, and after the bidding had been closed shortly after 11 A. M., the sealed proposals were not then publicly opened and read, but the bidding delayed until the arrival of the Ritangela representative some 20 minutes later. It is contended that the requirement that proposals be submitted at a specific time was material because it put all bidders on an equal footing and precluded favoritism, fraud or collusion, citing *Hillside Twp. v. Sternin,* 25 *N. J.* 317 (1957), and *Armaniaco v. Cresskill,* 62 *N. J. Super.* 476 (*App. Div.* 1960). Kingston alleges that what was done made the time fixed for the receipt of bids meaningless and ran contrary to the history of competitive bidding in this State for public bodies and public contracts.

In support of its contention that defendant violated its established bidding policy, Kingston refers to the testimony given by defendant's former chief engineer, who stated that during his tenure the Authority had strictly abided by the time requirement for submitting bids. He could not recall any occasion when a proposal was accepted after the bids were announced closed. Plaintiff also notes the testimony given by the Authority's highway design engineer, who said that he had personally examined the records for the past six or seven years and found only five contracts where bids were received after the deadline hour. As to two of these, he could furnish no factual background except that the bids had been opened at 11:30; in the third case no bids whatever had been received by 11 A. M., and in the fourth all proposals

submitted had been returned unopened. As to the fifth occasion, he testified that the Authority had advertised that bids would be opened at 11 A. M. Eastern Standard Time— an error, because Daylight Saving Time was then in effect. Those in charge of the bidding waited an hour to conform to the advertised time.

Plaintiff's argument must be resolved by first considering the nature of the New Jersey Turnpike Authority. *N. J. S. A.* 27:23–3 designates the Authority as "a body corporate and politic, with corporate succession." And see *N. J. S. A.* 27:23–5. It was so recognized in *Newark v. N. J. Turnpike Authority,* 7 *N. J.* 377, 381–382 (1951), where the late Chief Justice Vanderbilt said:

"* * * The Turnpike Authority is an independent public corporation especially created by the Legislature to carry out legitimate and important functions of government. It is a body both corporate and politic analogous in many respects to a municipal corporation, *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949). Like a municipal corporation it is vested with and enjoys a considerable degree of discretion as to the manner in which it carries out its functions. So long as such a corporation operates within the orbit of its statutory authority, it is well established that the courts will not interfere with the manner in which it exercises its power in the absence of bad faith, fraud, corruption, manifest oppression or palpable abuse of discretion, 2 *McQuillin, Municipal Corporations* (3rd ed. 1949), §§ 10.33–10.37 and the numerous cases there cited. * * *"

The "orbit" of defendant's statutory authority is delineated in *N. J. S. A.* 27:23–5, a general grant of powers of the broadest scope. Among them is that set out in *subsection* (j), giving the Authority the power to acquire by purchase or otherwise, "on such terms and conditions and in such manner as it may deem proper," or by condemnation, any land or other property which it may determine to be reasonably necessary for any Turnpike project. And *subsection* (l) empowers the Authority to "make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act [*N. J. S. A.* 27:23–1 *et seq.*]."

■ Plaintiff points to no statute governing the award of Turnpike contracts—the necessity of publicly advertising for bids, requirements for bidding, time for opening bids, the award of a contract to the lowest responsible bidder, and the like. We find none. Instead, plaintiff suggests that the statutes relating to state and municipal contracts may be consulted by way of analogy. Thus, it calls attention to the provisions of *L.* 1954, *c.* 48 (*N. J. S. A.* 52:34–6 *et seq.*), and particularly *N. J. S. A.* 52:34–6, which reads:

"All purchases, contracts or agreements, the cost or contract price whereof is to be paid with or out of State funds shall, except as otherwise provided in this act, be made or awarded only after public advertisement therefor, in the manner provided in this act."

The significant words here are "to be paid with or out of state funds." The Authority does not operate with state funds, but from the proceeds of its own bonds and other revenues, such as tolls. Its revenue bonds are not a debt or liability of the State, nor is the faith and credit of the State pledged therefor; the bonds, unless refunded, are payable solely from funds pledged or available for their payment as authorized by the New Jersey Turnpike Authority Act of 1948. *N. J. S. A.* 27:23–2 and 27:23–7; *N. J. Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949).

It is not inappropriate to refer to a decision of New York's highest court, *In the matter of Plumbing, etc. Ass'n, Inc. v. N. Y. State Thruway Authority,* 5 *N. Y.* 2d 420, 185 *N. Y. S.* 2d 534, 158 *N. E.* 2d 238 (*Ct. App.* 1959), where a contractors' association brought a proceeding to compel the Thruway Authority to withdraw its published notice to bidders and to publish a new one containing separate specifications so as to permit of separate bidding on each of the three subdivisions of work specified in section 135 of New York's State Finance Law. That law required that "Every officer, board, department, commission or commissions charged with the duty of preparing specifications or awarding or entering into contracts for the erection [or] construction * * * of buildings, for the state," must, where the entire cost of the work exceeded $25,-

000, prepare separate specifications for (1) plumbing and gas fitting; (2) steam heating, hot water heating, ventilating and air-conditioning apparatus, and (3) electrical wiring and standard illuminating fixtures, in order to permit separate and independent bidding upon each of these subdivisions of work. In confirming the Appellate Division, the court, through Fuld, J., held that the Thruway Authority was not a "board" or "department" of the State of New York within the meaning of section 135. As created by a special act of the Legislature, *L.* 1950, *c.* 143, the Authority was a "public corporation" for constructing and maintaining a thruway system. It was a corporation "independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission." The court, by way of illustration, noted some of the provisions creating the thruway system which served to emphasize its separate and independent existence and to distinguish it sharply from the type of state board or department which would be subject to the requirement of the State Finance Law with respect to bidding. Among these provisions was that notes and bonds issued by the Authority were its prime obligation, New York State's obligation being merely that of a guarantor to the maximum amount of $500,000,000. (Note that New Jersey does not guarantee defendant's obligations.) The court observed that the Thruway Authority enjoyed an existence separate and apart from the State of New York, even though it exercised a governmental function; however close its relationship to the state might be, the Authority stood on its own feet, transacted its business affairs through its own personnel and on its own initiative, and was not subject to the strict requirements imposed upon a state board or department by a provision such as section 135 of the State Finance Law.

Such was also the holding with regard to the New York Power Authority. *In the matter of L. I. Waldman & Co., Inc. v. New York Power Authority,* 18 *Misc.* 2*d* 886, 190 *N. Y. S.* 2*d* 88 (*Sup. Ct.* 1959).

Nor does *R. S.* 40 :50–1 *et seq.,* as amended, to which plaintiff refers us by way of analogy, apply. Those statutory provisions (including *R. S.* 40 :50–4, which provides that no bids shall be received before or after the hour designated for their receipt) apply to municipalities only. Accordingly,. *Hillside Twp. v. Sternin* and *Armaniaco v. Cresskill,* above, .are not apposite. Similarly, the provisions of *R. S.* 40 :25–1 *et seq.,* as amended (including *R. S.* 40 :25–8, which forbids the receipt of bids before or after the hour designated), have no pertinence since they apply to counties only.

In setting up the Turnpike Authority the Legislature did not place the same procedural limitations upon its contractual arrangements with others as it did in the case of municipalities, counties and state agencies. It expressly reposed in the Authority the right to conduct its operations and contract with others, so long as it exercised reasonable discretion and judgment in the circumstances. Defendant does not contend that it has an absolute right· to do as it wishes; its argument goes no further than that it exercised a proper and reasonable judgment in this case. It is to be noted that the Authority has no rule or regulation fixing the policy to be followed in advertising for and receiving bids, or in letting contracts.

The question, then, is whether defendant's actions under the circumstances here present represented a proper and reasonable exercise of its discretion and judgment within the authority delegated to it by the Legislature. We do not have here "bad faith, fraud, corruption, manifest oppression or a palpable abuse of discretion," referred to in *Newark v. N. J. Turnpike Authority,* above, 7 *N. J.,* at *pages* 381–382. Nor does plaintiff impute such conduct to defendant.

True, it appears that the practice followed by defendant in the past has been to receive bids at the hour fixed, 11 A. M. But such practice is not relevant in the sense of controlling the present situation. The factual situation with which we deal is that which faced the Authority, acting through its chief engineer, on the morning of April 16. He had accepted

four sealed bids from the contractors' representatives who were present, and immediately after announcing that the bids were closed was informed that a prospective bidder had been held up on the Turnpike because of construction activity. He personally knew of that construction and of the fact that it made for traffic tie-ups. He decided to delay the actual opening of the bids until the arrival of the late bidder, which happened 20 minutes later. Then, and only then, were the bids opened. There is no proof that any one of the four initial bidders left the room or used the phone. Nor is there any proof that Ritangela's representative had used the excuse of delay to mask an opportunity to get in touch with the other bidding contractors to find out the amounts of their bids. There is, in short, no proof of collusion or wrong conduct, or a reasonable probability that such occurred—in which case other considerations would, of course, apply. What occurred did not in any material or significant way put the bidders on an inequality or redound to the prejudice of the public authority.

Plaintiff stresses that the time set for the opening of proposals was a material condition of the bidding. The issue of materiality is pertinent only to the extent that it indicates or establishes that defendant was guilty of bad faith, fraud, corruption, manifest oppression or palpable abuse of discretion—in short, that by waiting for the delayed bidder it destroyed the reasonableness of the discretion or judgment exercised by it. As defendant points out, the reasons for its designation of a time for the receipt of proposals were two-fold: (1) administrative, *i. e.*, to keep the use of its personnel, time and facilities to a minimum by having bids opened at a particular time and place, and (2) security, *i. e.*, defendant's security, in order to prevent collusion by prospective bidders.

██ Although the Legislature in its wisdom has established rigid limitations upon the time for receiving bids by counties and municipalities, and sought to control bidding procedures by state agencies, it has, as already noted, left the Authority

with a broad discretion in such matters. Defendant's primary objective in advertising for the receipt of proposals—similar to the objective of the statutes governing state, county and municipal bidding—is to encourage free, open, fair and impartial competitive bidding. In our view defendant, acting within the orbit of its broad statutory power, exercised reasonable discretion and proper judgment to achieve this objective in the factual situation present. It waived a technicality which was neither pertinent to the substantive content of the proposals it had invited nor, under the circumstances, conducive to securing fair, impartial and open competitive bids at the most economical price.

■■ At the trial below plaintiff suggested that its submission of a bid effectuated a contractual arrangement with the Authority. An ordinary advertisement for bids is not in itself an offer. The bid itself is an offer, and it creates no right until accepted. 1 *Williston on Contracts* (3d ed. 1957), § 31, *p.* 82. This aside, article 3.1 of the contract documents, which, incidentally, is incorporated and made a part of the advertisement for bids, provides that the Authority "reserves the right to accept that proposal * * * which, in its judgment, will be in its best interests." And paragraph IX of the contract documents provides that the Authority "reserves the right to reject proposals if it is deemed advisable to do so in the best interests of the Authority." Clearly, there were no fixed and binding terms which, if met by a bidder, would immediately result in a contractual arrangement between the bidder and the Authority.

Accordingly, the judgment dismissing the complaint must be affirmed.

### III.

■ Turning to the counterclaim, we find the trial court's dismissal correct. Plaintiff had made its position clear to defendant by a timely verbal protest, followed by telegram and confirming letter. Defendant failed to respond to that protest before awarding the contract to Ritangela on April 30, 1963, nor did it return the certified check accompanying

plaintiff's bid within five days after the date of the opening of the proposals, in accordance with the provisions set out in the bidding brochure. Plaintiff had every reason to believe that its protest was being considered and that it would be advised concerning defendant's intentions.

In bringing its proceeding in lieu of prerogative writs, plaintiff acted promptly. The complaint sets out a justiciable cause of action, pursued in accordance with our rules of procedure.

The basis of the counterclaim is the claim filed with the Authority by Ritangela by reason of the three-hour work stoppage on the morning of May 6, 1963. However, this stoppage was not the result of the injunctive order plaintiff had obtained on May 3, but rather the result of a voluntary order of the Authority directed to Ritangela. The order to show cause only restrained the Authority from entering into a contract with Ritangela—no more. Further, defendant admittedly has made no payment to Ritangela on its proposed claim for damages. The basis for the counterclaim is an unliquidated and speculative claim on the part of the contractor.

The judgment is affirmed in all its parts.