902 A.2d 338 (2006)
386 N.J. Super. 600
STATE of New Jersey, Department of the Treasury, Division of Purchase and Property, Plaintiff-Appellant/Cross-Respondent,
v.
ERNST & YOUNG, L.L.P., Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted June 5, 2006.
Decided July 25, 2006.
*340 Zulima V. Farber, Attorney General, attorney for appellant/cross-respondent (Patrick DeAlmeida, Assistant Attorney General and Richard L. Evert, Deputy Attorney General, on the brief).
McCarter & English, attorneys for respondent/cross-appellant (William T. Reilly and Richard Hernandez, Newark, on the brief).
Before Judges CUFF, LINTNER and GILROY.
The opinion of the court was delivered by
CUFF, P.J.A.D.
Ernst & Young, L.L.P. (E & Y) was awarded a contract to provide services to two executive departments of the State of New Jersey regarding the obligations imposed on those departments by federal law to maintain privacy of personal medical records. When E & Y breached the agreement to provide services before it even commenced the contract, the State awarded the contract to another bidder at a significantly greater cost to the State. Although a judge entered summary judgment in favor of the State on liability, following a trial, the court declined to assess damages against E & Y because the State did not prove that it had mitigated its damages. We hold that the State is obliged to mitigate its damages and the State must make a reasonable effort to do so. Because the State did not demonstrate that it did so, we affirm.
As covered entities under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the New Jersey Department of Health and Senior Services (DHSS) and the Department of Human Services (DHS) are required to comply with the federal privacy regulations. In order to facilitate compliance with the regulations, DHSS and DHS decided to solicit proposals for professional advice and training regarding HIPAA.
A Request for Proposal (RFP) 03-X-34872 was issued on January 30, 2003. It states that its purpose "is to solicit proposals from qualified bidders to conduct a [HIPAA] privacy and security applicability analysis, gap analysis and risk assessment of existing [DHSS] and [DHS] policies, procedures and practices; to coordinate department-wide HIPAA evaluation activities"; to provide recommendations for implementation; and to assist "in the development of education and awareness training activities and materials."
The RFP includes both standard terms that appear in all State contracts and special terms that are unique to the HIPAA project. Included among the special terms are a description of the services required as related to the organizational structure of the departments, the scope of the work, and the time frame in which the project should be completed. The "contract effective date" listed on the first page of the RFP is April 1, 2003.
Several provisions of the RFP are relevant to the issues raised in this appeal. Section 2.2 of the standard terms is the State's general indemnification provision:
The contractor shall assume all risk of and responsibility for, and agrees to indemnify, defend, and save harmless the State of New Jersey and its employees from and against any and all claims, demands, suits, actions, recoveries, judgments and costs and expenses in connection therewith on account of the loss of *341 life, property or injury or damage to the person, body or property of any person or persons whatsoever, which shall arise from or result directly or indirectly from the work and/or materials supplied under this contract. This indemnification obligation is not limited by, but is in addition to the insurance obligations contained in this agreement.
Among the special terms is section 1.4.4, which explains bidder responsibility:
The bidder assumes sole responsibility for the complete effort required in this RFP. No special consideration shall be given after bids are opened because of a bidder's failure to be knowledgeable of all the requirements of this RFP. By submitting a proposal in response to this RFP, the bidder represents that it has satisfied itself, from its own investigation, of all of the requirements of this RFP.
Finally, there are two provisions that address timing aspects of the RFP. Section 4.4.4 states:
The bidder must submit all requested pricing information. Failure to submit all requested pricing information may result in the bidder's proposal being considered materially non-responsive. Each bidder must hold its price(s) firm for a minimum of ninety (90) days following bid opening to permit the completion of the evaluation of proposals received and the contract award process.
Section 5.4 states:
The term of the contract shall be for a period of one (1) year. The anticipated "Contract Effective Date" is provided on the cover sheet of this RFP. If delays in the bid process result in an adjustment of the anticipated Contract Effective Date, the bidder agrees to accept a contract for the full term of the contract. The contract may be extended for an additional two (2) periods of one (1) year or portion thereof, by mutual written consent of the contractor and the Director at the same terms and conditions. Prices shall be those quoted for the second year.
A mandatory pre-bid conference was held on February 21, 2003. At that time, a State representative told attendees that the "Contract Effective Date" of April 1, 2003, was only a target date and that it was subject to change. As a result of the conference, a written addendum to the RFP was issued on February 25, 2003. Neither the contract effective date nor any of the substantive provisions mentioned above were modified by the addendum.
Nine bid proposals were submitted in response to the RFP. An eight-member evaluation committee reviewed the proposals and scored each bid for cost and technical merit. Two bidders, CHC Healthcare Solutions and HIPAA Complete, were eliminated from consideration for submitting proposals that were deemed "materially nonresponsive." Of the seven remaining bidders, the three lowest in cost were Covansys, E & Y, and BearingPoint.
Covansys submitted a bid of $644,480, and was ranked sixth in technical merit. The Committee's award report, signed May 22, 2003, stated that Covansys was not recommended for the contract award "because the bid proposal provides insufficient specificity to enable the Committee to have confidence that COVANSYS' methodologies and deliverables would be consistent with the procedures and end products the State envisioned in issuing the RFP." It further noted that the Covansys staff had, on the average, fewer than two years experience in HIPAA-related work and that the proposal offered no web-based training opportunities. The report nevertheless stated that "[t]he Committee's overall perception is that the *342 bidder probably has technical competency appropriate to this RFP."
E & Y submitted a cost estimate of $650,000, and was ranked second in technical merit. The report praised E & Y for having superior public sector HIPAA assessment experience and for not proposing the use of any subcontractors. It commended several aspects of E & Y's approach as demonstrating flexibility, sensitivity to minimizing disruption in the workplace, and creativity in "training mode strategy alternatives." It also indicated the Committee's satisfaction with E & Y's proposed deliverables.
BearingPoint submitted a cost estimate of $1,209,000, and was ranked first in technical merit. The report noted that BearingPoint "has a strong Medicaid background, its training outline is good, and proposed deliverable databases are good." The report further stated, however, that
[t]he Committee views several aspects of the proposal negatively. The Committee does not intend this to be an all-inclusive list. The bidder provides hourly rates that do not include expenses, and therefore the proposal is not fully loaded. The bidder is not registered under its new name as authorized to do business in New Jersey. The cost proposal indicates the assessment and gap analysis would not include any of the Departments' residential facilities. The cost proposal is prohibitive.
The Committee unanimously recommended awarding the contract to E & Y. Christine Weiland, a Team Leader Supervisor from the Division of Purchase and Property who acted as Committee chairperson, wrote a recommendation report noting that E & Y had the second lowest cost and the second highest technical rank of the responsive bidders. With regard to the Covansys proposal, Weiland stated that "[t]he Committee determined that [E & Y]'s second ranked technical score (6542.5) compared to COVANSYS' sixth ranked technical score (3987.5) outweighs the $5,520 cost difference. Therefore, the Committee determined that the bid proposal submitted by [E & Y] represents the best value to the State, price and other factors considered."
Weiland notified E & Y on May 22, 2003, that the State accepted its bid proposal. Louis H. Feuerstein, a partner at E & Y, telephoned Weiland several times in June and July, asking to negotiate certain contract terms. Finally, on July 11, 2003, Feuerstein wrote to Weiland stating that E & Y could not accept the contract award. He claimed that the lapses of time between the contract effective date of April 1, 2003, the HIPAA compliance date of April 14, 2003, and the State's acceptance date of May 22, 2003, materially changed the circumstances surrounding the project. He asserted:
[We do not] believe that it is fair and equitable, or consistent with the RFP and assumptions embedded therein, to seek to bind us to an RFP issued and a bid submitted under an assumption that a contract would be effective and work would commence before legal compliance with a federal mandate was required, when the actual intention to make an award was not communicated until more than a month after legal compliance was required, even if the resulting contract is backdated to April 1.
Discussions between the State and E & Y continued throughout the summer, but no agreement was reached. The State ultimately terminated the E & Y contract on September 10, 2003.
Under pressure from DHS and DHSS to bring the State into HIPAA compliance, the Evaluation Committee reconvened in August and September, 2003. Covansys and BearingPoint were contacted and each *343 was asked if it could start work immediately for the price listed in its bid proposal. Each indicated that it could do so. Neither bidder was asked for a clarification of its original bid proposal.
Weiland testified that "the Committee was confused as to how to obtain a contract in this situation." She explained that the options were to go to the next bidder, rebid the contract, or seek a limited competition waiver. In light of the circumstances, she determined the best choice was to go with the "next bidder," which was BearingPoint. Weiland stated that the Committee based its choice of BearingPoint solely on the findings of its May 2003 award report. She believed that BearingPoint's score for technical merit was the critical deciding factor.
In response to questions from the court, Weiland admitted that the Committee's scoring of the bid proposals for technical merit was subjective. She further admitted that most of the evaluation numbers for Covansys fell into the "good" range. Acknowledging that the scores she gave Covansys were significantly lower than the scores it received from other committee members, she had a difficult time justifying her assignment of technical points. She also had difficulty explaining the high scores that she gave BearingPoint.
Margaret Moore, Technology Director for the Office of Children's Services at DHS, was a member of the Evaluation Committee. She testified that when the E & Y contract fell through, the Committee was uncertain how to proceed so it relied on the Division of Purchase and Property for direction. She stated:
I think that there was a question as to whether we should look at Covansys again to see if it was a possibility and BearingPoint because it was the next highest bid.... I think we had some questions thinking that maybe we could revisit their [Covansys'] bid, but I think inevitably we were told no, you have bypassed them.
She explained that the Committee did not award the contract to Covansys "because... the directive from Purchase and Property was that once you bypass somebody, you couldn't go back and revisit that."
Ruth Charbonneau, Director of the Office of Policy and Research in DHSS, also served on the Evaluation Committee. She testified that when it learned that E & Y would not perform under the contract, the Committee considered allocating resources within existing department staff to do the project, but decided instead to award a replacement contract to one of the two bidders closest to E & Y. She stated that Weiland told the Committee that it need not consider Covansys because it had been bypassed in the first bid evaluation.
Weiland prepared a report, dated September 26, 2003, that recommended that the replacement contract be awarded to BearingPoint. She wrote:
Based upon the report of the evaluation committee ... BearingPoint is the next qualified bidder. It is the next lowest cost and highest technical rank of the responsive bidders. The award to BearingPoint is deemed the most advantageous to the State, price and other factors considered. The estimated cost of the contract for the one-year period is $1,209,825, allocated as $588,396 to DHSS and $621,429 to DHS.
As justification for the choice, Weiland noted that time was of the essence and that BearingPoint had committed to begin work on the contract immediately.
E & Y argues on cross-appeal that the trial court erred in granting summary judgment in favor of the State on the issue of liability. It contends that no contract was ever formed between the parties because *344 the State unilaterally modified a material term of the agreement. It also contends that the unreasonable delay in awarding the contract terminated the State's power of acceptance.
The State responds that E & Y's bid proposal constituted an offer to enter into a contract with the State on the terms and conditions set forth in the RFP. It maintains that because the State accepted E & Y's offer in a manner that was fully consistent with the terms of the RFP, a binding contract was formed. Noting that there is no question that E & Y failed to perform, it asserts that the court correctly concluded that E & Y breached the contract.
On cross-motions for summary judgment, Judge Innes considered the RFP; bid proposals; Committee reports and records; correspondence; statements of uncontested material facts; and depositions of Weiland, Feuerstein, and Deborah Joslyn, a senior manager at E & Y. Of particular note is the deposition of Weiland in which she admitted that the contract effective date of April 1, 2003, was "wishful thinking" on the part of DHSS and could not realistically have been met in light of the bid opening date of March 14. Weiland went on to state: "I also believe, if my recollection is correct, on this one the date of April 1st was put here to try to gain some credibility with the federal government that we were trying to come into compliance." She maintained, however, that Charbonneau responded to a question at the pre-bid conference by indicating that the April 1 date was not realistic.
Judge Innes summarized the issue before the court as whether the State's May 22 acceptance of E & Y's bid proposal created a contract. Noting that a competitive bid on an RFP is an option contract, he stated that the State's letter served to create a contract "unless some sort of exception was present." He rejected E & Y's argument that postponement of the contract effective date constituted such an exception, reasoning that "there is no rule constraining the State from varying a term of the RFP." He also observed that E & Y presented no evidence that a delay of seven weeks in awarding a contract is an unreasonable period of time. The judge concluded that a contract was formed between the parties and E & Y's failure to perform constituted a breach of contract and a breach of the covenant of good faith and fair dealing.
Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). On appeal, the reviewing court applies the same legal standard as the trial court in determining whether the grant or denial of summary judgment was correct. Antheunisse v. Tiffany & Co., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). When considering the legal issues presented, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Here, there were no contested issues of fact regarding the RFP, E & Y's bid proposal, the State's May 22, 2003 acceptance letter, or E & Y's failure to perform. The only issue on which there was uncertainty was whether a State representative informed attendees at the pre-bid conference that the contract effective date was subject to change. This fact is not material to the question of liability, however, *345 because RFP section 1.3.3 states that "[a]ny revisions to the RFP resulting from the Mandatory Pre-Bid Conference will be formalized and distributed to attendees as written addendum to the RFP." Because the alleged statements were not memorialized in the written addendum, they were not incorporated into the RFP and hence not part of any contract formed between the parties. Moreover, RFP section 4.4.4 requires bidders to hold their prices firm for ninety days following the opening of bids to permit bid evaluation. This section is clear evidence that the projected starting date was no more than a target. As the parties raised no genuine issues of material fact, the question of liability was appropriate for summary judgment.
A bid submitted in response to an RFP is an offer that confers an option to contract upon the State. Kingston Bituminous Prods. Co. v. N.J. Tpk. Auth., 80 N.J.Super. 25, 36, 192 A.2d 836 (App.Div. 1963) (citing 1 Williston on Contracts § 31, p. 82 (3d ed.1957)); Conduit & Found. Corp. v. Atlantic City, 2 N.J.Super. 433, 438-39, 64 A.2d 382 (Ch.Div.1949) (citing Lupfer & Remick v. Bd. of Chosen Freeholders of the County of Atl., 87 N.J. Eq. 491, 497, 100 A. 927 (Ch.1917)). As long as the option remains unaccepted, it is a unilateral writing lacking the mutual elements of a contract; when it is accepted, an executory contract arises that is mutually binding upon the parties. Schlein v. Gairoard, 127 N.J.L. 358, 359, 22 A.2d 539 (E. & A.1941).
In order for a contract to form, however, there must be a "meeting of the minds," as evidenced by each side's express agreement to every term of the contract. Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538-39, 95 A.2d 391 (1953). "An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract. In the very nature of the contract, acceptance must be absolute." Id. at 538, 95 A.2d 391.
In this case, E & Y contends that the acceptance of its bid offer was not absolute because the State unilaterally modified the RFP's effective contract date of April 1, 2003. This argument ignores RFP section 5.4, which states that "[i]f delays in the bid process result in an adjustment of the anticipated Contract Effective Date, the bidder agrees to accept a contract for the full term of the contract."
E & Y does not argue that the change in effective contract date did not arise from "delays in the bid process." In fact, it does not address section 5.4 at all. Rather, it relies almost exclusively on the contention that the effective contract date was a material term that impacted its potential liability under the RFP's indemnification provision. E & Y cannot simply ignore the import of section 5.4, however, especially in light of RFP section 1.4.4 that holds the bidder responsible for knowledge of all the requirements of the RFP.
Section 5.4 allowed the State to change the anticipated contract effective date if delays arose in the bid process. For that reason, the State's acceptance of E & Y's offer on May 22, 2003, did not constitute a modification of the terms of the RFP. As the State's acceptance was absolute, a binding contract was formed.
E & Y's argument that the delay in accepting the contract terminated the State's power of acceptance is also unavailing. There is no question that an offeree must accept an offer within the time specified in the offer, or, if no time is specified, within a reasonable time. Restatement (Second) of Contracts § 41(1) (1981). "What is a reasonable time is a question of fact, depending on all the circumstances *346 existing when the offer and attempted acceptance are made." Id. at § 41(2).
E & Y contends that the sixty-nine days that elapsed between the bid opening date of March 14, 2003, and the acceptance date of May 22, 2003, constituted an unreasonable time in light of the State's need to meet the federal compliance deadline of April 14, 2003. Again, this contention ignores the plain language of RFP section 4.4.4, which states that "[e]ach bidder must hold its price(s) firm for a minimum of ninety (90) days following bid opening to permit the completion of the evaluation of proposals received and the contract award process." This provision was sufficient to notify E & Y that the State considered evaluation times of ninety days to be reasonable for this RFP.
One other circumstance merits consideration. On April 24, 2003, while the bids were still being evaluated, the State formally requested that E & Y clarify certain technical aspects of its proposal. E & Y's written response of April 28, 2003, provided the information that the State sought, but did not take any exceptions to the RFP or request any modifications to its terms. By April 24, 2003, it was clear that the contract would not be awarded by the April 1 contract effective date or the April 14 compliance deadline. If E & Y believed that the State's delay in awarding the contract had modified a material term of the RFP, it could have so stated in its letter of April 24. Its failure to do so implies that, at the time, E & Y did not believe that the State's evaluation period was unreasonable.
Because the acceptance was absolute and was tendered within a reasonable time of the offer, a binding contract was formed between E & Y and the State. E & Y acknowledged that it did not perform under the contract. For that reason, the court did not err in finding that E & Y breached the contract. The court also did not err in finding E & Y liable for breach of the covenant of good faith and fair dealing. See generally, Wade v. Kessler Inst., 172 N.J. 327, 340, 798 A.2d 1251 (2002) (explaining that every contract contains an implied covenant of good faith and fair dealing). Therefore, we affirm the grant of summary judgment in favor of the State on the issue of liability.
In its appeal, the State argues that the court erred by applying the doctrine of mitigation of damages to a publicly bid contract and by substituting its own assessment of the merits of the bids for that of the Evaluation Committee. It asserts that it was not required to mitigate its damages by awarding the replacement contract to Covansys because doing so would have subverted the intent of the public bidding laws and endangered the State's compliance with HIPAA. It claims that the standard of review that should be applied to a mitigation claim under these circumstances is the same gross abuse of discretion standard that applies to any State contract award.
E & Y responds that it is well-settled that an injured party must take reasonable steps to mitigate damages incurred from a breach of contract. It asserts that there is not a single case, in any jurisdiction, to support the proposition that the State is exempt from this fundamental duty. It argues that as a responsive and responsible bidder capable of fulfilling the requirements of the RFP, Covansys did not present a risk to the State's HIPAA compliance. It contends that the gross abuse of discretion standard proposed by the State does not apply here and, even if it did, the State cannot justify its refusal to consider Covansys as a reasonable alternative to BearingPoint.
At trial, Judge Koenig reviewed the relevant documents and heard the testimony *347 of Weiland, Moore, and Charbonneau. Although he never specifically addressed the legal criteria that applied to the State's damages claim, he clearly adopted a standard of reasonable care.
Judge Koenig expressed skepticism regarding the manner in which the Committee chose BearingPoint as the recipient of the replacement contract:
They [the Committee] weren't beyond throwing bidders out for failing to be technically compliant, because they threw two out. But they left Covan[sys] in. Time is a third factor. That's a red herring because they started in January and they were getting further and further behind time wise. And instead of throwing all the bids out after [E & Y] was terminated they elected to do what they wanted to do, take the most technically compliant remaining bidder regardless of the price.... It almost seems as if their selection criteria are vague, ambiguous and indefinable. They jump on whatever they want to jump on and justify what they want to do which was at that point they wanted to go to BearingPoint....
Finding that the Covansys bid represented a reasonable alternative to the BearingPoint proposal, Judge Koenig concluded that the State should have chosen Covansys as a replacement contractor in order to mitigate its damages. He observed that by selecting BearingPoint, the State put itself in a better position than it had been in with E & Y.
Explaining why he believed the Committee was unreasonable in choosing BearingPoint, Judge Koenig said:
[The Committee's] failure to give any serious consideration to the Covan[sys] alternative which I hear from each one of the witnesses in different language Covan[sys] was eliminated from serious and legitimate consideration without just cause when they did the August round. They took the position we've already bypassed them. So that if that's the case then price isn't important. But price is important. You can say price isn't dispositive. You've got three things. It's a matrix. Price, technological compliance and time. And each one of these things was weighed in one way or another in the minds of the committee. And they went with BearingPoint for reasons as far as I'm concerned best known to the committee. I think it was subjective and I think they could have mitigated. They had a mitigation alternative available to them and I think their failure to take it would be unfair to impose that cost on Ernst & Young.
Judge Koenig emphasized the theme of fundamental fairness throughout his decision. In summing up his holding, he stated: "I don't think that's the way that Ernst & Young is entitled to be treated. I don't think they have to foot the bill for this and I don't think it would be fair to make them foot the bill. My judgment's for the defense."
The court's decision was rendered in response to E & Y's motion for a judgment following the close of the State's case. "[I]n deciding a R. 4:40-1 motion for judgment the court must accept as true all the evidence which supports the position of the non-moving party, according him or her the benefit of all legitimate inferences, and if reasonable minds could differ, the motion must be denied." RSB Lab. Servs., Inc. v. BSI Corp., 368 N.J.Super. 540, 555, 847 A.2d 599 (App.Div.2004). On appeal, the reviewing court applies the same standard. Ibid.
Whether the State made reasonable efforts to mitigate its damages was a question for the trier of fact. Ingraham v. Trowbridge Builders, 297 N.J.Super. 72, *348 84, 687 A.2d 785 (App.Div.1997). "Thus, the proper standard in a non-jury case regarding the judge's decision on mitigation of damages `is whether the judge's findings are supported by sufficient, credible evidence in the record.'" Ibid. (quoting Fanarjian v. Moskowitz, 237 N.J.Super. 395, 406, 568 A.2d 94 (App.Div.1989)).
Whether the State had an obligation to mitigate its damages and if so, what standard applies, are questions of law. When reviewing questions of law, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, supra, 140 N.J. at 378, 658 A.2d 1230.
The trial judge's factual findings concerning the subjectivity of the technical evaluation scores and the arbitrary conduct of the Committee are adequately supported by credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). The critical question is whether the judge correctly required the State to mitigate its damages and whether he correctly applied the "reasonableness" standard to the State's actions.
"Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Pickett v. Lloyd's, 131 N.J. 457, 474, 621 A.2d 445 (1993). "Compensatory damages are designed `to put the injured party in as good a position as he would have had if performance had been rendered as promised.'" 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961) (quoting 5 Corbin on Contracts § 992, p. 5 (1951); 1 Restatement of Contracts § 329 comment a (1932)). Compensatory damages should be in an amount reasonably within the contemplation of the parties at the time the contract was formed and sufficient to put the injured party in the same position it would have enjoyed if the breaching party had performed, no better position and no worse. Donovan v. Bachstadt, 91 N.J. 434, 444-45, 453 A.2d 160 (1982); Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J.Super. 275, 292-93, 723 A.2d 976 (App.Div.1998).
It is well-settled that parties injured by a breach of contract have a common law obligation[1] to take reasonable steps to mitigate their damages. McDonald v. Mianecki, 79 N.J. 275, 299, 398 A.2d 1283 (1979); White v. Twp. of N. Bergen, 77 N.J. 538, 546, 391 A.2d 911 (1978). "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts `without undue risk, burden or humiliation.'" Ingraham, supra, 297 N.J.Super. at 82-83, 687 A.2d 785 (quoting Restatement (Second) of Contracts, § 350(1) (1981)).
"Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected. . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise . . . The amount of loss that he could reasonably have avoided by . . . making substitute arrangements. . . is simply subtracted from the amount that would otherwise have been recoverable as damages."
[Id. at 83, 687 A.2d 785 (quoting Restatement (Second) of Contracts, § 350 comment b (1981)).]
*349 "`[T]he burden of proving facts in mitigation of damages rest[s] upon the party breaching the contract.'" Ibid. (quoting Cohen v. Radio-Elecs. Officers Union, 275 N.J.Super. 241, 262, 645 A.2d 1248 (App. Div.1994), modified on other grounds, 146 N.J. 140, 679 A.2d 1188 (1996)).
The State makes two arguments with regard to mitigation of damages. First, it claims that the obligation of mitigation cannot be imposed on the State because to do so would subvert the purposes of the public bidding laws. Second, it asserts that even if it were required to mitigate damages, it could not have awarded the contract to Covansys without creating undue risk to the public.
It has long been recognized that "[b]idding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition." Terminal Constr. Corp. v. Atl. County Sewerage Auth., 67 N.J. 403, 409-10, 341 A.2d 327 (1975).
N.J.S.A. 52:34-12 contains the criteria governing the award of a contract pursuant to public advertising and bids. N.J.S.A. 52:34-12(g) states that award of a public contract "shall be made with reasonable promptness . . . by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered." Courts have interpreted this provision as conferring broad discretion on the Director of the Division of Purchase and Property to determine which bid will be most advantageous to the State. Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 548, 222 A.2d 4 (1966); In re Honeywell Info. Sys., Inc. Protest of Contract Award Requisition X-32, 145 N.J.Super. 187, 199-200, 367 A.2d 432 (App.Div.1976), certif. denied, 73 N.J. 53, 372 A.2d 318 (1977). The award of a contract pursuant to N.J.S.A. 52:34-12(g) generally will not be disturbed absent a showing of bad faith, corruption, fraud or gross abuse of discretion. Commercial Cleaning Corp., supra, 47 N.J. at 549, 222 A.2d 4.
The Director's broad latitude and discretion to award contracts is, however, limited to the "ultimate business decision to exercise his discretion as between responsible bidders whose bids conform to the invitation, based on his determination as to which bid `will be most advantageous to the state, price and other factors considered.'" In re Protest of the Award of the On-Line Games Prod. and Operation Servs. Contract, Bid No. 95-X-20175, 279 N.J.Super. 566, 593, 653 A.2d 1145 (App. Div.1995). In On-Line Games, the court refused to extend the gross abuse of discretion standard to the Director's decisions on bid conformity. Id. at 592, 653 A.2d 1145. In so doing, it reasoned that State contracts merit no more deferential a standard of review than local public contracts on matters implicating the fundamental goals of the public bidding statutes. Id. at 592-93, 653 A.2d 1145.
The obligation to mitigate damages is not incompatible with the purpose of public bidding. The State, or any public contractor, has the same opportunity to evaluate the strength of each bid based on price and other factors, such as technical competence, when it is required to select another contractor following a breach by the party originally awarded the contract as during the initial evaluation and award process. Once, however, the State seeks damages from the defaulting party and measures the damages as the difference *350 in price between the initial contract and the second contract, different interests arise.
Case law from the federal courts supports the obligation of a public contractor to mitigate damages. In Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir.2002), the court observed that the federal government was required to make "reasonable efforts in the form of affirmative steps ... to mitigate damages" after a private contractor breached an agreement to purchase property owned by the Small Business Administration. The principal issue in that case did not involve whether the government had an obligation to mitigate, but whether the steps taken by the government were reasonable under the circumstances. Id. at 1333.
In Ketchikan Pulp Co. v. United States, 20 Cl.Ct. 164, 166 (1990), the United States Claims Court held that "the government has a duty to mitigate its damages when a purchaser or seller breaches its contract with the United States." The court noted that "the contractor in breach should not be charged with damages which the government could have avoided with reasonable effort and without undue risk or expense." Ibid.
Likewise, in Thomas Creek Lumber & Log Co. v. United States, 36 Fed.Cl. 220, 247 (1996), the Court of Federal Claims recognized that the United States Forest Service had an obligation to mitigate its damages after a contractor breached a service contract. The court observed that "[t]he Forest Service is given broad discretion in the reprocurement (resale) process. That discretion, however, must not be abused. The test is whether, under all the circumstances, the Forest Service acted reasonably.... The government is only required to act reasonably and promptly given the circumstances." Id. at 247-48 (citations omitted) (quotations omitted).
There is no obvious reason why the State should not be held to the same standard as the federal government. Because the State sought to enforce its right to damages under the common law of contract, it follows that it should be subject to the common law doctrine of mitigation.
The fallacy of the State's position is highlighted when it argues that it bypassed Covansys when it initially awarded the contract to E & Y. The State fails to recognize that it also bypassed BearingPoint when it initially awarded the contract to E & Y. In the first instance, E & Y was selected over Covansys because E & Y earned higher scores on technical ability. E & Y was selected over BearingPoint due to the vast price disparity between otherwise technically similar bidders. The feature that is absent in the second award following E & Y's breach is a reasoned analysis of the pros and cons of the Covansys and BearingPoint bids and an articulated rationale for selecting the BearingPoint bid. The absence of this comparison and a statement of reasons in support of the State's second selection is what renders the decision unreasonable in the context of an attempt to impose the difference in the amount of the contracts on E & Y as damages for its breach.
Here, failure to follow the same procedure in the second award process as the initial award process left the State unable to articulate a reasonable basis for the award to BearingPoint. None of the State's witnesses could explain the specific basis on which technical points were assigned to Covansys, E & Y or BearingPoint. Weiland, in particular, was unable to justify her assignment of points to these bidders despite careful questioning from the court. All of the witnesses, however, admitted that the Committee was confused as to how to proceed in awarding a replacement contract. Each stated that she *351 did not consider Covansys for the award because it had previously been bypassed.
As noted, Covansys, the lowest cost bidder, was bypassed in May, as was BearingPoint, the highest rated technical bidder. The witnesses failed to explain why it was appropriate to consider one bypassed bidder but not the other. In May, the Committee justified choosing E & Y over Covansys because E & Y's second ranked technical score, when compared to Covansys' sixth ranked technical score, outweighed the $5,520 cost difference. The question that went unanswered in September was whether BearingPoint's first ranked technical score, when compared to Covansys' sixth ranked technical score, outweighed the $564,520 cost difference.
Because the Committee failed to compare the BearingPoint and Covansys bids, the State is left with the frail argument that the Covansys proposal was so facially deficient as to represent a threat to the public welfare. This contention is not borne out by the record.
Although the Committee eliminated two bidders from consideration for not conforming to the RFP, it determined that Covansys had submitted a responsive proposal. Its May 2003 award report commended Covansys for the strong information technology experience of its staff and concluded that it "probably has technical competency appropriate to this RFP." Moreover, most of the Committee's technical evaluation totals for Covansys fell into the "good" range and a few even fell in the "very good" range. Although the Committee cited areas of weakness in the Covansys proposal, it also cited several negatives in the BearingPoint proposal. Nothing on the face of the Covansys proposal appears palpably deficient, and the State mentions no specifics other than the fact that Covansys did not offer web-based training opportunities. The RFP, however, did not require the provision of web-based training.
The Committee justified its selection of BearingPoint on the fact that "time was of the essence" and BearingPoint had committed to begin work immediately. Weiland admitted, however, that Covansys had also informed the Committee that it could begin work as soon as the contract was awarded. Thus, it is not clear that there is a time-based distinction between the two. Further, as Judge Koenig observed, the time issue is a red herring here. Although the HIPAA regulations were promulgated in December 2000, the State did not begin to formulate the RFP until September 2002. The RFP was then shelved for several months before being resurrected in January 2003. Despite a compressed bidding schedule that set an opening date of March 14th, the contract was not awarded until May 22, 2003, more than five weeks after the April 14th compliance deadline had passed. Clearly, any time pressure that the State experienced was of its own making.
Judge Koenig properly evaluated the State's conduct by a reasonableness standard. Furthermore, the trial judge's ultimate factual finding that the State did not make a reasonable effort to mitigate its damages is well-supported by the record. Therefore, we affirm the judgment dismissing the State's claim for damages at the close of the State's case.
Affirmed.
NOTES
[1] Corbin recommends against referring to the doctrine of mitigation as imposing a "duty" on the injured party, preferring the term "obligation" instead. 11 Corbin on Contracts § 57.11, pp. 303-05 (2005).