29 A.3d 1066

SEAN WOOD, L.L.C., PLAINTIFF–APPELLANT/CROSS–RESPON-
DENT, v. HEGARTY GROUP, INC. AND KEN HEGARTY, DE-
FENDANTS–RESPONDENTS/CROSS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted November 16, 2010—Decided April 12, 2011.

502

504

Before Judges WEFING, PAYNE and KOBLITZ.

*Damiano M. Fracasso,* attorney for appellant/cross-respondent.

*Advokat & Rosenberg,* attorneys for respondents/cross-appellants (*Jeffrey M. Advokat,* on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

In an action filed in the Special Civil Part, plaintiff, Sean Wood, L.L.C., sought payment in the amount of $14,583.25 from defendants, the Hegarty Group, Inc. and Kenneth Hegarty, individually, that it alleged was owed on two contracts for rigging out, loading and delivering industrial machinery and tanks to two of the Hegarty Group's customers. The Hegarty Group counterclaimed, alleging lost profits in excess of the Special Civil Part's jurisdictional limit of $15,000 as the result of a breach of contract by Wood, resulting in the Hegarty Group's inability to completely satisfy a purchase order by its customer, Perry Videx Company.

Following a six-day bench trial in the matter, the trial judge issued a written decision in which he awarded Wood a judgment against the Hegarty Group in the sum of $2,500 and dismissed the Hegarty Group's counterclaim as the result of its failure to mitigate damages. All parties have appealed. We affirm the judgment in favor of Wood, but remand to permit that judgment to be reduced by $500 to reflect a credit given by Wood to the Hegarty Group and to permit the entry of that judgment against Kenneth Hegarty as well as the Hegarty Group. We also affirm the dismissal of the Hegarty Group's counterclaim.

I.

Evidence at trial disclosed that Wood entered into a contract with the Hegarty Group, dated December 26, 2008, that required Wood to rig out of their location in Carlstadt, New Jersey and transport thirteen stainless steel tanks to the facilities of Perry

Videx in South Jersey at a price of $16,500 and to pump the oil from and transport three injection molding machines to Perry Videx at a price of $6,083.25 for a total price of $22,583.23. A $10,000 deposit was made on the contract. A second contract with the Hegarty Group, dated January 6, 2009, required Wood to load and transport tanks to a customer in North Collins, New York for a price of $5,000 with a fifty percent deposit.

Both contracts were executed on behalf of the Hegarty Group by Kenneth Hegarty, who was understood by Wood's president, Sean Wood, to be the owner of the company. A business card given by Hegarty to Wood listed his position as Operations Manager. A police report entered in evidence in the matter listed Hegarty as the "owner" of the Hegarty Group. However, at trial, Hegarty denied that he was either a shareholder or employee of the Hegarty Group. Although he said he was assumed to be its vice-president, he was instead merely "helping" the company. Hegarty testified that, in the months of December 2008 through February 2009, he was unemployed and collecting unemployment insurance benefits. Hegarty testified that the Hegarty Group was his wife's company, but that she authorized him to make deals and sign contracts. He stated that neither he nor his wife received a paycheck from the Hegarty Group, and that its only salaried employee was receptionist Amelia Barone, the niece of Hegarty's wife. Further, he stated that he had purchased the tanks and machinery that were subsequently sold by the Hegarty Group to Perry Videx by use of his own funds.

The second contract was performed in January 2009, but upon performance, the remaining balance of $2,500, which was further reduced by a $500 credit given by Wood, was not paid by Hegarty. At trial, Hegarty and painting contractor Mark Brill stated that discussions had occurred regarding joint marketing, and that Wood had agreed to contribute $2,500 to the endeavor, using for that purpose the remaining balance of the second contract with the Hegarty Group. Thus, nothing was owed on that contract. Wood acknowledged that discussions had occurred, but he stated

that he had not agreed to make a monetary contribution to the effort.

In connection with the first contract, the drained injection molding machines and five of the tanks were delivered to Perry Videx on January 16, 2009. However, as the result of Sean Wood's concern that the remaining balance would not be paid, Wood determined that he would only permit the delivery of the remaining tanks COD. Both Hegarty and Perry Videx were informed of this condition; neither manifested assent. On Thursday, January 22, 2009, three tractor trailer trucks carrying the remaining eight tanks were dispatched from Main Trucking, the trucker retained by Wood. On arrival at the Perry Videx facility, one truck bearing two tanks was unloaded. However, Wood insisted that the company be paid prior to permitting the other two trucks to be unloaded. When payment was not forthcoming, Wood directed the trucks to return with their loads to Main Trucking's facility. According to Linda B. Jacobs, a Perry Videx employee, upon learning of Wood's COD demand, she called Hegarty to determine whether he would authorize Perry Videx to pay the balance that Hegarty owed to Wood and to subtract that amount from the balance due from Perry Videx to Hegarty. Hegarty refused to authorize that transaction.

By letter dated January 22, Sean Wood informed Hegarty that, as the result of his refusal to pay the balance for the work performed, two oversize trailer loads were placed in storage, where they would remain until payment was received. Hegarty was also informed that the cost of storage was $100 each per day, and that he was responsible for that amount, plus the additional shipping charges incurred for the return of the two trailers. Hegarty responded in an undated letter, stating that there was no refusal, as the contract did not specify COD. "After a complete inspection and acceptance from Perry Videx, the contract would have been fulfilled; I would have received payment, and forwarded you the money owed in a timely fashion." The letter continued:

Due to the damage that you caused during rigging and shipment, and lack of shipping the man hatches that you removed, I was penalized $18,069.00 from Perry Videx because they denied the acceptance of the tank. As per the rate of storage at $100.00 per day, that will be paid by you for not fulfilling the contract. I have already filed a police report in Carlstadt, NJ and as of January 25, 2009, the tanks were considered stolen, because there was no correspondence relayed to Hegarty Group as to the location of the tanks after they were removed from final location.

According to Sean Wood, on Monday, January 26, he spoke with Al Beck, the Hegarty Group's "lead man" at the time, who claimed that Hegarty had lost $18,000 as the result of the non-delivery, and that if the money were restored, Wood could do what he wanted with the tanks. On January 27, Wood responded to Hegarty's letter, stating, in part:

Your letter in regards to Fulfillment of Contracts is unacceptable.... I have fulfilled my contract with the only change being placing a COD on the balance of the tanks. This was necessary when I was told of your intent of none [sic] payment for the tank work.

I would like for us[ ] both to take a deep breath and examine the following possibility grant me to this Friday Jan 30, 2009 to find another buyer for the remaining tanks. This was your ultimate design to b[u]y and then resell all of the tanks. If I am not successful I will pay the difference on your losses based on the following.

A settlement offer was then outlined.

Wood spent Monday and Tuesday seeking another purchaser for the remaining tanks obtaining, on Wednesday, January 28, a firm offer for four of the tanks in the amount of $12,500. Beck was informed of the offer, and he agreed to advise Wood of Hegarty's response to it.

Hegarty rejected the offer, testifying that Wood would have kept the purchase price as payment for amounts he claimed were due to him, and that Hegarty would not have received his lost profits. On January 29, Hegarty, accompanied by the Ridgefield police, took possession of the tanks. Hegarty directed Main Trucking to deliver them to a specified lot, where they were unloaded in a fashion that destroyed their commercial value.

On January 30, Wood filed suit against the Hegarty Group[1] alleging breach of contract, the creation of a constructive trust, unjust enrichment, breach of the covenant of good faith and fair dealing, and conversion. Counsel for Wood also prepared a notice to cease and desist, addressed to Hegarty and the Hegarty Group and personally served on February 2, which stated:

PLEASE TAKE FURTHER NOTICE THAT pursuant to the New Jersey Uniform Fraudulent Transfer Act, *N.J.S.A.* 25:2–20, *et seq.* and all other applicable laws of the State of New Jersey and the United States of America, you are hereby placed on notice that you are to jointly and severally cease and desist from the direct or indirect, absolute or conditional, voluntary or involuntary disposal or parting with *thirteen* (13) aboveground stainless steel tanks which have come into the physical and/or constructive possession of Hegarty Group, Inc. by virtue of rigging and trucking services rendered by Sean Wood, LLC or an interest in the said chattels as well as the payments of money, releases, leases and the creations of liens and other encumbrances involving the said chattels.

Hegarty claims to have entered into a contract to sell the tanks for scrap prior to service of the cease and desist order. At some point prior to February 11, they were cut up, and in the period between February 11 and February 20, they were sold to Donjon Recycling for a total price of $4,104.06.

Testimony at trial also disclosed that, on March 6, 2009, Linda B. Jacobs, the Manager, Sales Administration, at Perry Videx wrote a letter to Amelia Barone at the Hegarty Group, in which she stated:

Re: Tanks covered by our Purchase Order MG9482

We did not accept (2) 10,500 gallon tanks as they were received buckled.

We did not accept:

two (2) 3,000 gallon tanks

-one (1) 3,200 gallon tank

-one (1) 5,000 gallon tank

as they were missing mayways, sight glasses and other important pieces.

Jacobs testified at trial that she understood the letter was requested for insurance purposes. She testified further that, contrary to her statement, in which she conceded she had "used

---

[1] The complaint was later amended to include Kenneth Hegarty as a defendant.

the wrong words," nothing was rejected. Although the tops of the two 10,500 gallon tanks were buckled,[2] she testified regarding the tanks that Perry Videx "would never have sent them back." Rather, they would have been unloaded and repaired, and a price adjustment would have been sought. Additionally, and contrary to the testimony of Hegarty, Jacobs stated that Perry Videx had never been re-offered the tanks after Hegarty had replevied them.

Amelia Barone, who also testified at trial, stated that she had been instructed by Hegarty to obtain the letter from Jacobs, who sought it as back-up for litigation and for insurance purposes. In this connection, the following exchange occurred:

Q Okay. So as far as insurance is concerned, the goods were damaged, correct?
A Yes.
Q But as far as this litigation is concerned, it was because of COD?
A Yes.

Evidence was introduced at trial that Perry Videx reduced the purchase price offered for the tanks by $18,069 following the non-delivery of January 22.

As we have previously stated, in an extensive written opinion issued following the trial of the matter, the judge awarded damages of $2,500 in favor of Wood and against the Hegarty Group,[3] and he dismissed the Hegarty Group's counterclaim. In reaching his conclusion to award damages of $2,500 on the January New York contract, the judge rejected the testimony given by Hegarty regarding the set-off for advertising expense, finding Hegarty's testimony to have been "less than credible." Otherwise, the judge declined to award damages in Wood's favor, determining that it had breached its contract with the Hegarty Group by unilaterally

---

[2] Jacobs testified that damage to the top of tall tanks cannot be detected *in situ* by the purchaser at the time of initial sale.

[3] The order of judgment lists in the caption only the Hegarty Group, Inc. as defendant. "Judgment for Plaintiff" was entered in the body of the order without further specification of the liable party or parties. In his written opinion, the judge designated the Hegarty Group as ("Defendant"), and "Defendant" was ordered to pay plaintiff $2,500 pursuant to the January 2009 contract.

seeking to add a COD provision to which the Hegarty Group did not agree and as a result, delivery was not effected. Additionally, the judge found that the record did not support Wood's claim that the company had a reasonable and justifiable fear of non-payment permitting it to anticipatorily repudiate the contract. He rejected Wood's claim of a property interest in the goods, and therefore rejected the company's theories of constructive trust, conversion, and breach of the New Jersey Uniform Fraudulent Transfer Act. The judge found no breach by the Hegarty Group of its covenant of good faith and fair dealing in connection with the Perry Videx contract, determining that its decision to withhold payment arose only after Wood had breached that contract and, because damages were awarded in connection with the other contract, the applicability of the covenant to it need not be determined.

With respect to the counterclaim, the judge acknowledged evidence of a net loss of $18,069. He recognized, as well, that the loss had been occasioned by Wood's breach of contract. However, he found that, once possession of the tanks had been reclaimed, the Hegarty Group sold them as scrap for less than their worth if sold intact. After recognizing the existence of a common law obligation to mitigate damages, the judge found:

> Defendant–Counterclaimant chose to sell the undelivered tanks for scrap metal, realizing a far less return than they might have had they sold the tanks whole. Due to the speculative nature of calculating the potential return had Defendant proceeded with an alternative means of mitigating loss, the Defendant has failed to establish a concrete measure of damages.

This appeal and cross-appeal followed.

## II.

Wood's brief in support of its appeal naturally focuses on the December 2008 contract to rig, load and ship equipment and tanks to Perry Videx. In this connection, Wood claims that the trial judge erred in finding that it breached the contract, that it was entitled to *quantum meruit* damages, and that the judge erred in dismissing its claim pursuant to the Uniform Fraudulent Transfer Act. Wood additionally claims that the judge erred in not

specifying the defendant against which damages were assessed and in not rendering a judgment of joint and several liability.

With respect to Wood's *quantum meruit* claim, its counsel argued on closing and here that the total amount of the Perry Videx delivery contract was $22,583.25. $5,583.25 of that amount was attributable to the undeniably completed work of pumping out and delivering the three pieces of injection molding equipment, leaving a balance of $16,499.75. From that amount, counsel subtracted $8,249.87, which he attributed to the completed rigging operations, leaving a balance of $8,249.87. He then divided that figure by the thirteen tanks for a unit value of $634.60 and, because seven tanks were delivered, he claimed that another $4,442.23 in incurred costs were undisputed, leaving charges in dispute of $3,807.63. It was then Wood's position that the company was entitled to all sums that were not in dispute and that the total, after the initial deposit had been subtracted was $8,775.62 [4] —the amount of *quantum meruit* damages claimed.

According to Wood, although the judge recognized, in connection with the judge's award of damages under the New York contract, the principle that it would be unjust for a party to retain a benefit without payment, citing *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 100 *N.J.* 166, 184, 495 *A.*2d 66 (1985), he did not apply the same theory to the Perry Videx contract. As a result, the judge essentially transformed the remaining balance on that contract into a liquidated damages clause.

 Quasi-contractual recovery on the basis of *quantum meruit* " 'rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.' " *Weichert Co. Realtors v. Ryan*, 128 *N.J.* 427, 437, 608 *A.*2d 280 (1992) (quoting *Callano v. Oakwood Park Homes Corp.*, 91 *N.J.Super.* 105, 108, 219 *A.*2d 332 (App.Div.1966)). "Courts generally allow recovery in quasi-contract when one party has conferred

---

[4] $22,583.25–10,000.00 = 12,583.25–3,807.63 = $8,775.62

a benefit on another, and the circumstances are such that to deny recovery would be unjust." *Ibid.*

To recover under this theory, Wood was required to establish: " '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services.' " *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen,* 172 *N.J.* 60, 68, 796 *A.*2d 238 (2002) (quoting *Longo v. Shore & Reich, Ltd.,* 25 *F.*3d 94, 98 (2d Cir.1994) (internal quotations and citations omitted)). Although Wood has met its burden with respect to the first three factors, we agree with the judge's implicit finding that it failed to demonstrate the fourth.

In this regard, we note that there was no testimonial foundation for counsel's arbitrary apportionment of half of the contracted-for cost of rigging, loading and shipping the thirteen tanks to the rigging process. Further, we question whether Wood conferred a benefit upon the Hegarty Group in connection with rigging out and loading the six undelivered tanks, when in fact the undertaking with respect to those tanks remained incomplete as the result of failure of delivery. As a final matter, we note that the record contains no evidence that would support counsel's claim that the shipping costs for the thirteen tanks was susceptible to pro rata apportionment, and we question that method, given the substantial differences in the size and construction of the various tanks. For all we know, payment of the initial $10,000 deposit may have represented adequate compensation for the work performed by Wood. In any case, proofs to the contrary are lacking.

III.

Wood claims additionally that it did not breach its contract to deliver the last six tanks because those tanks were rejected by Perry Videx as nonconforming. In light of the testimony of Linda Jacobs that the company would never have sent the tanks back, but would instead have sought a price adjustment in connection

with any damage found to exist, and her essential repudiation of the content of the March 6 letter to Amelia Barone, we cannot accept Wood's argument in this regard. While evidence suggests that Hegarty sought to recast events in a light contrary to fact in order to obtain an insurance recovery, that evidence does not, in the circumstances presented, constitute competent proof of what clearly took place. Wood refused to make delivery when its demand for COD payment was not met.

As the judge found, Wood unilaterally inserted the COD provision into its contract with the Hegarty Group without the consent of that entity. Wood claims that it was justified in doing so as the result of reports that Hegarty had stated to others that he was planning on withholding payment on his contracts with Wood. If justified under these circumstances, Wood could have demanded adequate assurance of future performance. In that connection, the *Restatement (Second) of Contracts* § 251 (1981) provides:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance. (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

"Whether the obligee's asserted grounds to demand adequate assurance are 'reasonable,' and whether the obligor's response is 'adequate,' are ordinarily questions of fact for the jury." *Spring Creek Holding Co., Inc. v. Shinnihon U.S.A.*, 399 *N.J.Super.* 158, 179–80, 943 *A.*2d 881 (App.Div.), *certif. denied,* 196 *N.J.* 85, 951 *A.*2d 1038 (2008).

In this case, evidence was introduced that, in response to an interrogatory to Wood requesting the substance of any declarations against interest by Hegarty, Wood responded:

> Ken Hegarty admitted to Sean Wood circa the 2nd week of January 2009 that the Plaintiff was owed entire amount in dispute, but the Plaintiff was not going to get paid because of the Sun Products contract which the Plaintiff was awarded.

Testimony at trial suggested that Wood and Hegarty had competed for Sun Product's business. However, counsel for the Hegarty Group disputed this statement noting, among other things, that Wood was willing to make a delivery to Perry Videx on January 16, which would have been after Hegarty's alleged statement and during the period when Wood allegedly felt insecure. Additionally, during Wood's testimony the following exchange occurred:

Q Now did there ever come a time that Mr. Hegarty declared—or somebody from the Hegarty Group declared that they were not going to pay you?

A Yes. That was on or about the 14th of January.

Q Okay. And did you [m]ake any efforts to demand assurances that you were going to be paid?

A Yes.

Q All right.

A That's when I sent the one letter.

However, no letter from Wood to Hegarty in this time period was introduced into evidence at trial. The only correspondence by Wood was to Perry Videx, an entity that was not a party to the contract between Wood and Hegarty, and thus not in a position to offer any assurances of payment.

Further, there was evidence that the Hegarty Group had not paid the remaining $2,500 on the New York contract, there was evidence of friction between Wood and Hegarty, and there was some direct testimony by independent witness Joseph Iellimo that he had heard Hegarty express an intention not to pay Wood for its work. However, Hegarty consistently testified that, when confronted by Wood with the demand of COD payment, he declined, but that he offered payment, in accordance with contract terms, after delivery had been made and the goods had been accepted.

After hearing this disputed evidence, the trial judge ruled that "insufficient evidence ha[d] been submitted to establish a valid reason for the unilateral modification." We decline to disturb the judge's factfinding, which could reasonably have been made on the record presented. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). As a consequence, we affirm the judge's conclusion that Wood's refusal to deliver the

final six tanks without COD payment constituted an unwarranted anticipatory breach of the contract with the Hegarty Group. *Spring Creek, supra,* 399 *N.J.Super.* at 178–79, 943 *A.*2d 881 (discussing anticipatory breaches of contract).

## IV.

■ Plaintiff Wood next claims that the trial judge erred in dismissing its claim pursuant to the Uniform Fraudulent Transfer Act (UFTA), *N.J.S.A.* 25:2–20 to –34. We disagree.

*N.J.S.A.* 25:2–25 provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

a. With actual intent to hinder, delay or defraud any creditor of the debtor; or

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation; *and* the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due. (Emphasis supplied.)

■ The evidence demonstrates that the Hegarty Group and Hegarty were served, on January 30, 2009, with a UFTA cease and desist notice, and that the six remaining tanks, which were damaged during unloading by Hegarty, were thereafter cut up and sold for scrap to Donjon Recycling for a total price of $4,104.06. Our prior analysis has established that, as the result of Wood's breach of the contract for delivery to Perry Videx, it lost its creditor status on that claim.[5] It remained a creditor on the

---

[5] Although as the result of its contract with the Hegarty Group, Wood was a bailee for hire, *LaPlace v. Briere,* 404 *N.J.Super.* 585, 598–99, 962 *A.*2d 1139 (App.Div.) (discussing bailments), *certif. denied,* 199 *N.J.* 133, 970 *A.*2d 1049 (2009), at the time that Hegarty repossessed the tanks, a bailee's lien as the result of nonpayment had not arisen, because the contractual time for payment had not passed. *See* 8A *Am.Jur.2d Bailments* § 151 (2009) ("The existence of

January New York contract as the result of Hegarty's nonpayment of the remaining $2,000 owed on that contract. However, the amount realized on the sale to Donjon was more than sufficient to permit payment of that amount. As a consequence, the conveyance of the tanks in the form of scrap metal to Donjon did not constitute a fraudulent conveyance.

## V.

 Wood makes a final argument that the trial judge erred by not entering judgment jointly and severally against the Hegarty Group and Kenneth Hegarty. We agree.

 Our review of the evidence supports the conclusion that Kenneth Hegarty, despite his protestations, was an owner of the Hegarty Group and used the corporation as his alter ego, thereby abusing the corporate form and advancing his own interests.

> "The principle is well settled in New Jersey that the doctrine of piercing the corporate veil is employed when fraud or injustice has been perpetrated." *Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie)*, 230 B.R. 36, 42 (Bankr. D.N.J.1998). An individual may be liable for corporate obligations if he was using the corporation as his alter ego and abusing the corporate form in order to advance his personal interests. *Id.* Veil piercing is an equitable remedy whereby the court disregards the corporate existence and holds the individual principals liable for the corporation's debts. *In re Blatstein*, 192 F.3d 88, 100 (3d Cir.1999); *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir.2002). Consequently, the individual and the corporation are treated as one for liability purposes.
>
> [*Casini v. Graustein*, 307 B.R. 800, 811 (Bankr.D.N.J.2004).]

See also *Marascio v. Campanella*, 298 *N.J.Super.* 491, 502, 689 A.2d 852 (App.Div.1997); *Walensky v. Jonathan Royce Intern.*, 264 *N.J.Super.* 276, 283, 624 A.2d 613 (App.Div.), *certif. denied*, 134 *N.J.* 480, 634 A.2d 527 (1993); *Stochastic Decisions v. DiDomenico*, 236 *N.J.Super.* 388, 394, 565 A.2d 1133 (App.Div.1989), *certif. denied*, 121 *N.J.* 607, 583 A.2d 309 (1990).

---

payment terms in the bailment contract which are inconsistent with the right to a bailee's lien generally will negate the right to such a lien.")

■ Before invoking an alter ego theory to pierce the corporate veil, evidence must first establish an independent basis to hold the corporation liable. *Casini, supra,* 307 *B.R.* at 811. Here, the New York contract was executed by Kenneth Hegarty on behalf of the Hegarty Group, Hegarty testified without contradiction that he was authorized to execute the contract, and it was breached.

Further, if Hegarty is to be believed, the Hegarty Group has insufficient assets to satisfy the judgment against it, having, according to him, only $700 in its bank account.

There is also ample evidence that Hegarty was using the Hegarty Group as his alter ego in both of the transactions at issue here. In that connection, Hegarty testified that, although purchased in the Hegarty Group's name, the tanks and other equipment to be delivered to Perry Videx were purchased with his personal funds. In his letter responding to Wood's correspondence of January 22, Hegarty stated that but for Wood's breach "I would have received payment"; "I was penalized $18,069.00"; "I will be sending copies of my contract with Perry Videx to your insurance company"; and "I will be requesting $18,069.00 from your insurance company." In a handwritten instruction to Main Trucking Company, dated January 29, 2009, Hegarty stated: "I Ken Hegarty want my tanks to stay at Main Trucking Ridgefield." When asked what happened to the money received from Perry Videx, Hegarty testified: "you know, we didn't get the money because the tanks weren't delivered, so we only got $26,000 and I used that to pay myself back for buying—purchasing the tanks because I personally purchased the tanks, loaned Hegarty Group the money to buy those, that's why I'm in such financial problems right now and Hegarty Group only had $700 in the account."

Additionally, Hegarty testified "I fund the company," and he admitted to generating income for it that benefited his wife, the company's president. As far as the Hegarty Group was concerned, Hegarty was the "go-to guy." Even if Hegarty himself did not have an ownership interest in the Hegarty Group, as the

result of his wife's ownership interest and delegation of authority to him, he was able to use that entity as his alter ego and to abuse the corporate form to advance his own personal interests. Accordingly, we conclude that Wood demonstrated a basis for entry of judgment against Kenneth Hegarty as well as the Hegarty Group, and we remand for entry of a judgment that reflects that fact.

## VI.

We next turn to the cross-appeal from the denial of the counterclaim for damages asserted by the Hegarty Group. In opposition to that cross-appeal, Wood notes that the counterclaim was asserted only by the Hegarty Group. Yet, the uncontroverted evidence that we have just set forth establishes that the tanks and equipment at issue were purchased by Kenneth Hegarty, utilizing his own funds, and such payment as was made by Perry Videx was taken by Kenneth Hegarty as partial repayment of the purchase price paid by him. The evidence thus establishes that Kenneth Hegarty was the real party in interest in connection with the counterclaim and that the Hegarty Group lacked standing to prosecute its counterclaim for lost profits. *N.J. Citizen Action v. The Riviera Motel*, 296 *N.J.Super.* 402, 411–13, 686 *A.*2d 1265 (App.Div.), *certif. granted*, 152 *N.J.* 13, 702 *A.*2d 352 (1997), *appeal dismissed*, 152 *N.J.* 361, 704 *A.*2d 1297 (1998). Thus, we affirm dismissal of the counterclaim.

■ If we assume that the Hegarty Group had standing to bring the counterclaim, we reach the same conclusion. We have previously recognized

that parties injured by a breach of contract have a common law obligation to take reasonable steps to mitigate their damages. *McDonald v. Mianecki*, 79 *N.J.* 275, 299 [398 *A.*2d 1283] (1979); *White v. Twp. of N. Bergen*, 77 *N.J.* 538, 546, 391 *A.*2d 911 (1978). "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts 'without undue risk, burden or humiliation.'" *Ingraham [v. Trowbridge Builders,]* 297 *N.J.Super.* [72,] 82–83 [687 *A.*2d 785 (App.Div.1997)] (quoting *Restatement (Second) of Contracts*, § 350(1) (1981)).

> "Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected . . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise. . . . The amount of loss that he could reasonably have avoided by . . . making substitute arrangements . . . is simply subtracted from the amount that would otherwise have been recoverable as damages."

> [*Id.* at 83, 687 *A.*2d 785 (quoting *Restatement (Second) of Contracts*, § 350 comment b (1981)).]

> [*State of N.J. v. Ernst & Young, L.L.P.*, 386 *N.J.Super.* 600, 617–18, 902 *A.*2d 338 (App.Div.2006) (footnote omitted).]

The party breaching the contract bears the burden of proving the absence of mitigation. *Id.* at 618, 902 *A.*2d 338.

■ In the present case Wood, having determined not to deliver that six remaining tanks without payment, returned the tanks to Main Trucking's facility, where they remained on the flatbeds upon which they had been loaded until they were replevied by Hegarty on January 29. There is no competent evidence in the record that would suggest that the tanks could not have been redelivered by Hegarty to Perry Videx, that Perry Videx would have refused them, or that it would have failed to pay a price for the tanks that was less than it would have paid following the first delivery.[6] However, Perry Videx employee Linda Jacobs testified that Hegarty never contacted the company after regaining possession. Hegarty testified to the contrary. However, his statement that Perry Videx rejected his offer of redelivery was hearsay.

Accordingly, we affirm the trial judge's conclusion that the Hegarty Group failed to mitigate its damages, and as a consequence, recovery on its counterclaim was precluded. We decline to address the parties' remaining arguments, finding them to lack sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

---

[6] Because Perry Videx had already determined that the two thirteen-foot tanks were damaged, it would not have paid the full contract price if the tanks had been off-loaded on January 22, but would instead have negotiated a lesser price.

Affirmed and remanded to permit entry of an amended judgment of $2,000 against the Hegarty Group and Kenneth Hegarty, jointly and severally.